NORTHWESTERN TERRA COTTA CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 67183. Filed August 19, 1960.

*Walter Wm. Pearson, Esq.*, for the petitioner.
*Don S. Harnack, Esq.*, for the respondent.

MULRONEY, *Judge:* The respondent determined deficiencies in petitioner's income tax in the amounts of $10,787.75 and $52,678.24, for the years 1952 and 1953, respectively. Petitioner corporation sold real property in the taxable years in question. In reporting gain or loss it claimed its transferor's basis under section 113(a) (22), I.R.C. 1939,[1] alleging that it had received the property through a court-approved plan of reorganization qualifying under section 112(b)(10). Respondent determined a deficiency based on the reasoning that petitioner did not receive the property pursuant to an approved plan under section 112(b)(10), or, if it did, then the transferor's basis used by petitioner was incorrect. The sole issue for decision is whether respondent's determination on these issues was correct.

FINDINGS OF FACT.

Most of the facts have been stipulated. They are found accordingly.

Petitioner is an Illinois corporation with its principal place of business in Chicago. It prepared its income tax returns on an accrual basis and for the years in question filed returns with the district director of internal revenue at Chicago, Illinois.

The record presents a long, complex history of the ownership of the land sold by petitioner during the years in question. In December of 1922 the Northwestern Terra Cotta Company (herein-

---

[1] All section references herein are to the Internal Revenue Code of 1939, as amended

after sometimes called Company), acquired substantially all of the assets of the Chicago Ceramic Company for $525,000 cash, $500,000 in first mortgage bonds, $175,000 in notes, and $1,500,000 in 7 per cent cumulative preferred stock, and it assumed all of the obligations of the Chicago Ceramic Company.

Included among the assets received by Company were certain parcels of land consisting of about 945,556 square feet situated in the city of Chicago. This land was improved with buildings, kilns, sheds, and miscellaneous structures designed expressly for use in the manufacture and sale of terra cotta. On its books, Company assigned a value of $1,273,175.44 to the land. Near the end of 1922 Company executed and delivered its mortgage deed of trust (hereafter called the mortgage) to a Chicago trust company and conveyed to it the real estate acquired from Company's predecessor to secure an issue of 6 per cent real estate first mortgage serial bonds in the amount of $1,500,000.

In 1931 a creditors' bill was filed against Company in the United States District Court for the Northern District of Illinois, Eastern Division, and receivers, one corporate and one individual, were appointed by the court. Later that same year a proceeding to foreclose the mortgage was brought in the same court by the trustee under the mortgage and consolidated with the creditors' suit. No decree of foreclosure on the mortgage was ever entered by the District Court.[2]

The receivers continued to operate Company for several years at a loss. In July 1934 the District Court approved a plan, described as a plan of liquidation for Company, which had been submitted to the court by the receivers and other parties in the suit. Pursuant to this plan and under order of the court, Northwestern Terra Cotta Corporation (hereafter called petitioner) was organized about August of 1934. In exchange for all its issued capital stock, the receivers transferred to petitioner $50,000 in cash, all of Company's current accounts receivable, inventories, goodwill, and tangible personal property. Under the plan approved by the District Court the receivers as lessors and petitioner as lessee entered into a lease with option to purchase Company's Chicago plant and property, consisting of 383,328 square feet. The lease was for benefit of mortgage bondholders and was drawn for a term of 10 years. The option, which included the buildings, equipment, and improvements, provided for purchase of the leased premises at any time during the

---

[2] Between the years 1923 and 1928, Company acquired terra cotta manufacturing properties in Denver, Colorado, St. Louis, Missouri, and Chicago Heights, Illinois. Ancillary receiverships were had for these properties, but the history of these receiverships is not recited here for the parcels sold during the years in question were obtained by Company from Chicago Ceramic Company.

first 5 years of the lease at a price of $285,000 and during the last 5 years of the lease at a price of $335,000. The lease with the option was subsequently extended so as to expire on December 31, 1948.

Petitioner took over operation of the Chicago business from the receivers in September of 1934. It issued 125,000 shares of common stock to receivers for distribution to creditors. The ultimate distribution to creditors was as follows:

| Class of creditors | Full amount of claims as finally adjudicated | Shares to be issued [1] | Percentage of total |
|---|---|---|---|
| General creditors | $149,261.24 | 7,463.06 | 6+ |
| 3-year 6 per cent noteholders | 782,311.50 | 39,115.58 | 36+ |
| 1st mortgage bondholders (Chicago plant) | 1,106,233.22 | 55,311.66 | 51− |
| 1st mortgage bondholders (Chicago Heights plant) | 135,000.00 | 6,750.00 | 6+ |
| Total | 2,172,805.96 | 108,640.30 | ------ |

[1] This distribution is based on the percentage of one share for each $20 of the total amount of the claim as finally adjudicated.

In 1935 Terra Cotta Properties Company (hereafter called Properties I), an Illinois corporation, was organized as a nominee by the successor trustee under the mortgage, who held all of its stock. By order of the District Court, Company and the receivers conveyed all their right, title, and interest in the mortgaged property to Properties I.

Substantial property taxes were outstanding in 1939 against the mortgaged properties then held by Properties I. Pursuant to a plan approved by the District Court, a complaint to foreclose the county tax lien on the portion of the property covered by the lease was filed in an Illinois court by the State of Illinois in 1939. The Illinois court scheduled the tax sale for the middle of 1940.

The successor trustee under the mortgage organized a corporation, the 1750 Wrightwood Corporation (hereinafter called Wrightwood), and caused all its stock to be issued to him as trustee for the bondholders under the mortgage. On July 16, 1940, at the public sale under the tax lien, the property was struck down to Wrightwood for $60,000, which amount was paid. No redemption was made and the Illinois court subsequently ordered a deed to the property made and delivered to Wrightwood. The deed was delivered in July 1943.

Company's receiver was discharged by the Federal District Court on December 30, 1940.

In July 1942 the successor trustee for the bondholders under the mortgage filed an action in the Superior Court of Cook County, Illinois. The complaint asked that the court, after assuming jurisdiction of the subject matter and parties, administer the trusts and

approve certain contemplated actions. The court subsequently determined that it had jurisdiction of the trust, and approved a plan of reorganization of Properties I, which plan was submitted by the successor trustee.

In accordance with this plan:

a. Properties I changed its name to 2525 Clybourn Ave. Corporation (hereafter also referred to as Properties I).

b. The successor trustee organized a new corporation called Terra Cotta Properties Corporation (hereafter called Properties II), which was authorized to issue 11,000 shares of stock.

c. Properties I executed and delivered a deed for all its right, title, and interest of all the mortgaged properties to the newly created Properties II.

d. The successor trustee quitclaimed to Properties II all interest in the following property:

(1) About 55,311 shares of petitioner constituting about 51 per cent of its issued stock.

(2) All the outstanding common shares of Properties I.

(3) All the outstanding shares of Wrightwood.

(4) All other property held by the successor trustee not previously transferred to Properties II.

By virtue of these transfers Properties II held the title to all of the original land which had secured Company's mortgage, part of which was now subject to petitioner's lease. Properties II also owned 55,311 shares of petitioner.

The successor trustee then caused a voting trust to be created, and caused all the outstanding shares of Properties II to be issued to it. Participation certificates in the voting trust were delivered to the bondholders in proportion to their interests, in redemption of the bonds under the mortgage. The bonds so redeemed were canceled. The successor trustee then issued to Properties II a release deed removing the mortgage obligation. This release was approved by the Illinois court. After completing the transfer of assets to Properties II, Wrightwood and Properties I were dissolved. At this point, Properties II held title to the original 945,556 square feet of land without encumbrances of a tax lien or mortgage lien and with 383,328 square feet of said land leased to petitioner. Properties II proceeded to try to sell the realty. It experienced difficulty securing a purchaser for the leased property because of the option to purchase provision of the lease but it did succeed in selling seven parcels of the real estate not covered by the lease, or a total of 217,478 square feet for $301,500 and it distributed the proceeds of the sales to the former bondholders, now holders of participation certificates in the voting trust.

The real estate holdings of Properties II in the early months of 1946 consisted of 383,328 square feet leased to petitioner and 344,750 square feet adjacent thereto. There was also a pending cash offer by outside purchasers to buy all or substantially all of the land not subject to the lease for $97,200. About this time petitioner made its proposal to buy all of the remaining property by transferring to Properties II certain of its securities and stock. The proposal and the comments of the voting trustees of Properties II thereon are contained in the voting trustees' report of May 6, 1946, as follows:

Under the lease the Operating Company [petitioner] has an option to purchase the Leased Property and the Kiln Yard at a total option price of $357,-500.00. The pending cash offer to purchase the Paulina Street Property is for $97,200.00. The total of these figures is $454,700.00. The securities to be issued by the Operating Company under the proposal in exchange for the above-mentioned properties consist of $275,000.00 in principal amount of bonds, plus 46,420 shares of common stock. While not listed on any National Securities Exchange, shares of the common stock of the Operating Company have recently been sold through brokers in over-the-counter sales at from $4.00 to $4.50 per share. Assuming the present market conditions will continue, and assigning a value of $4.00 per share to the common stock, the securities which would be received in exchange for the properties will aggregate $460,680.00 which is in excess of the sum of the option prices and the pending cash offer for the Paulina Street Property.

Petitioner's proposal was accepted and about March 18, 1947, pursuant to order of the Illinois State court, the remaining land of Properties II was transferred to petitioner and petitioner transferred its $275,000-face-value convertible bonds and 46,420 shares of its fully paid nonassessable common stock to Properties II. Also, pursuant to the court order, the trustees then liquidated Properties II, paying a liquidating dividend of 44,000 shares of petitioner's common stock and $275,000 in principal amount of bonds to the participation certificate holders in exchange for their certificates which were then canceled.

After acquiring title, petitioner immediately sold to a third party a parcel containing about 42,000 square feet for $30,000. In its 1947 return petitioner set forth in Schedule J: "Acquired by purchase from Terra Cotta Properties Corp. (net) Land $154,122.19 * * * Buildings, $218,457.19, Kilns, $57,685.73 * * *."

In 1950 petitioner sold 16,302 square feet of its realty for $20,377.50 and on its income tax return for that year it used a basis of $6,162.86, or approximately 37 cents a square foot, for said land.

During the year 1952 petitioner sold about 43,574 square feet of its real property for $120,000. On its income tax return for that year in determining gain from the sale, it used a basis for the real

property of $64,849.18, of which it allocated $58,824.90 to the land and the remainder to improvements.

During the year 1953 petitioner sold several parcels of real property, in total about 212,162 square feet, for $300,312.24. On its income tax return for that year in determining loss from the sales it used a basis for the real estate of $320,777.60, of which it allocated $286,418.70 to the land and the remainder to improvement. On both the 1952 and 1953 returns petitioner stated that it had received the property in a reorganization under section 112(b)(10) and was using as its basis for the property sold its transferor's (Company's) basis determined under section 113(a)(22).

Respondent in the statutory notice adjusted petitioner's net income by reducing the basis for the land sold to $17,333.53 for 1952 and to $63,882.56 for 1953. In the explanation of the adjustments respondent indicated that the adjustments had been made to reflect the disallowance of the use of the alleged transferor's basis. Respondent further explained that the land sold was not acquired in a section 112(b)(10) reorganization and consequently section 113(a)(22) did not apply.

OPINION.

The parties are agreed that the basic issue is whether petitioner acquired the land it sold in 1952 and 1953 in a section 112(b)(10) reorganization of Northwestern Terra Cotta Company. If it did, then, under the provisions of section 113(a)(22), petitioner's basis for the land sold would be the same as Company's. We think the record shows quite clearly petitioner did not acquire the land it sold during the years in question in a section 112(b)(10) reorganization. The last cited statute provides, in part:

SEC. 112. REORGANIZATION OF GAIN OR LOSS.

(b) EXCHANGES SOLELY IN KIND.—

*     *     *     *     *     *     *

(10) GAIN OR LOSS NOT RECOGNIZED ON REORGANIZATION OF CORPORATIONS IN CERTAIN RECEIVERSHIP AND BANKRUPTCY PROCEEDINGS.—No gain or loss shall be recognized if property of a corporation, * * * is transferred, in a taxable year of such corporation beginning after December 31, 1933, in pursuance of an order of the court having jurisdiction of such corporation—

(A) in a receivership, foreclosure, or similar proceeding, * * *

*     *     *     *     *     *     *

to another corporation organized or made use of to effectuate a plan of reorganization approved by the court in such proceeding, in exchange solely for stock or securities in such other corporation.

The first requirement of the statute is that there be a court-approved plan of reorganization of the corporation in receivership. It must be a plan of reorganization as distinguished from a plan of liquidation.[3] Petitioner sees this first requirement satisfied by the

_____
[2] H. Rept. No. 1079, 78th Cong., 2d Sess., 1944 C. B. 1059, 1062.

liquidation plan of the receivers of Northwestern Terra Cotta Company, which was approved by the United States District Court for the Northern District of Illinois, Eastern Division, in July of 1934.

It is to be noted the court-appointed receivers called the plan a "Proposed Plan for Liquidating The Northwestern Terra Cotta Company." If the plan set out the method by which the Company was to be reorganized, the receivers calling it a plan to liquidate would probably not be significant. But here the plan was not to reorganize the corporation in receivership in the sense that a new corporation would be formed to which the property of the old corporation would be transferred solely in exchange for the latter's stock and securities. True, the plan called for the formation of petitioner to which the operating area of Company would be leased, and to which some of Company's cash and personal property would be transferred. Petitioner acquired no interest in real estate under this plan beyond a leasehold interest to a little more than a third of Company's land and a right to purchase the leased land by the payment of dollars and not its securities. The plan provided the receiver "shall abandon all of the mortgaged real estate of The Northwestern Terra Cotta Company" and then proceed to liquidate the remaining assets, not transferred to petitioner. Abandoning the mortgaged realty meant turning it over to the bondholders or the receivers representing their interests or their nominee. The other proceedings taken by the bondholder interests involving the creation of Properties I, Wrightwood, and Properties II, were for the purpose of bringing the bondholders' interest in the legal title of all of Company's mortgaged realty in one entity, Properties II, free and clear of a tax lien and the mortgage lien, but subject to petitioner's lease and option to purchase covering a portion of said realty.

It is significant that the receivership of Company in United States District Court for the Northern District of Illinois, Eastern Division, ended in 1940 and the receiver was dismissed. The termination of the receivership found all of the property of Company disposed of. Unmortgaged real or personal property had been liquidated or turned over to the new corporation. All of the mortgaged realty had been abandoned to the bondholder interests. Stock in the new corporation was held by or for the creditors of the old, including the bondholders who held approximately 51 per cent of such stock. No continuation of the receivership was necessary for by then Properties I had been organized as a nominee by the trustee under the mortgage and it held the conveyance from Northwestern Terra Cotta Company of all of the mortgaged premises. Also prior to the termination of the receivership the tax lien had

been extinguished and Wrightwood had been formed by the trustee under the mortgage and it held all of the stock in petitioner that had been issued for the bondholders under the mortgage. There was no need to continue the court receivership because of petitioner's lease with option to purchase. The lien of the mortgage on the leased property had been extinguished by the tax deed. If the lease were terminated, possession would be taken by the titleholder—at that time Properties I. If the option were exercised it would be the result of business judgment and no court approval would be necessary, insofar as petitioner would be concerned, to supervise the transfer from Properties I or any successor titleholder of the leased land.

The proceedings taken in the Illinois State Court were no part of the early plan of United States District Court of July 1934. The trustee for the bondholders brought this State court action to aid and assist him as trustee in the liquidation and distribution of the trust assets. Petitioner was not a party to that action though, of course, the trustee who was a party held approximately 51 per cent of petitioner's stock.

We need not again recount the State court proceedings. They were not intermediary steps designed to lead to the ultimate transfer of Company's land for petitioner's stock and securities. True, the ultimate end was a transfer of some of the land for petitioner's stock and securities of the value of $460,680. But this occurred merely because it was the best offer the trustee had received. It is not clear in the record that the trustee was the majority stockholder of petitioner at this time. At any rate, the transfer was not a part of the plan of the initial receivership in the Federal court. It was not then contemplated there would be a transfer of land for securities. It is also true that the transfer of land for securities was approved by the Illinois State court. But this court approval was not necessary so far as petitioner was concerned. It was necessary for the trustee who was operating under court orders in his disposition and liquidation of the trust assets.

Both parties treated the 1947 transfer of land to petitioner as a sale, ascribing a value to the stock of $4 a share. Petitioner in his 1947 return reporting its acquisition of its plant site reported it as "Acquired by purchase from Terra Cotta Properties Corp." and ascribed values to the buildings and land. The value given to the land was $154,122.19 and to the buildings and kilns there was ascribed a total value of $276,142.92. But these were net values and it is manifest they do not include the simultaneous sale by petitioner of a parcel for approximately $30,000 and perhaps some other items of transfer expense. At any rate, if consideration is given to the $30,000 sale we find petitioner in 1947 reporting the transaction

as its *purchase* of its plant and ascribing net values as between buildings and land totaling within a few hundred dollars of the $460,680, the value ascribed by the seller to the stock and securities that represented the purchase price. When petitioner sold a parcel in 1950 it used a basis that was not based on a section 112(b)(10) reorganization of Company.

We hold petitioner did not acquire the land it sold in the years in question in a section 112(b)(10) reorganization, and, therefore, is not entitled to use the basis of Northwestern Terra Cotta Company. We do not understand petitioner questions the basis used by the Commissioner in his determinations of deficiencies if petitioner is held not to be entitled to use Company's basis.

*Decision will be entered for the respondent.*